## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **CHRISTOPHER MALDONADO HAEUSSLER AND CHRIS MALDONADO HAEUSSLER** <br> Plaintff <br><br> vs. <br><br> **GRUPO HIMA-SAN PABLO, INC. d/b/a HOSPITAL HIMA SAN PABLO BAYAMÓN; LUIS FORTI ISALES M.D., JANE DOE, AND THEIR CONJUGAL PARTNERSHIP; PROFESSIONAL PARTNERSHIP X, Y, & Z; DR. JOHN DOE, DR. RICHARD DOE, & DR. JOHN ROE; JANE DOE, JAMIE DOE, JOAN ROE; CORPORATIONS X, Y & Z; D, E and F INSURANCE COMPANIES** <br><br> Defendants | **CIVIL NO:** <br><br> Subject:  Medical Malpractice |

## COMPLAINT

COME  NOW  plaintiffs  through their undersigned  attorney, and very respectfully **STATES**, **ALLEGES** and **PRAYS** as follows:

### I.  JURISDICTION

1.      The diversity jurisdiction of this Court is invoked under the provisions of Title  28 of the United States Code, Section 1332 (a) (1), and Article III of the Constitution of the  United States, inasmuch as this is a civil action that involves an amount in controversy in excess of seventy-five thousand dollars, exclusive of interest and costs, and every issue of law and  fact alleged herein is wholly between citizen of different states.

2.      The Statutes of Limitation was tolled by the notification of extrajudicial claims on January 16, 2014 and January 24, 2014 and by the filing of a state complaint on January 15, 2015.

1

## II. PARTIES

3.      Plaintiffs Christopher Maldonado Haeussler and Chris Maldonado Haeussler are the brothers of Christian Maldonado Haeussler, are of legal age, citizens of and domiciled in the State of Florida, United States of America.

4.      Co-defendant, Grupo HIMA-San Pablo Inc. d/b/a Hospital HIMA San Pablo Bayamón ("**HIMA San Pablo**") is a duly licensed hospital organized under the laws of  the Commonwealth of Puerto Rico, with its principal place of business in the said Commonwealth of Puerto Rico.

5.      Co-defendant, Luis Forti Isales M.D., ("**Dr. Forti**") his wife Jane Doe and  the conjugal partnership formed between them are citizens of the Commonwealth of Puerto Rico.

6.      Co-defendants, Professional Partnership X, Y, & Z are entities organized under the laws of the Commonwealth of Puerto Rico duly authorized to do business in Puerto Rico whose name is not known at this time but are jointly and severally liable to plaintiff with the rest of the defendants for the facts alleged in the complaint.  The real identity of said partnerships will be substituted once plaintiff knows such.

7.      Co-defendants, Dr. John Doe, Dr. Richard Doe and Dr. John Roe are natural individuals citizens of the Commonwealth of Puerto Rico designated as unknown defendants who are jointly and severally liable to the plaintiff with the rest of the defendants for the facts alleged in the instant complaint, whose names are not known at this time. The real identity of said individuals will be substituted once plaintiff knows such.

8.      Co-defendants, A, B, and C Corporations are corporations duly registered and authorized to do business in Puerto Rico whose name is not known at this time but are jointly and severally liable to plaintiff with the rest of the defendants for the facts alleged in the complaint. The real identity of said corporations will be substituted once plaintiff knows such.

2

9.     D, E and F Insurance Companies are insurance companies duly authorized to do business in Puerto Rico that has issued an insurance policy in favor of one or more co-defendants to the instant action that covers the claims alleged in the instant complaint. The real identity of said insurance companies will be substituted once plaintiff knows such.

10.     At the time of the actions and omissions alleged herein, the defendant physicians were married to unknown defendants Jane Doe, Jamie Doe and Joan Roe, with whom they had constituted conjugal partnerships, which were benefited by their actions in the course of practicing medicine, and therefore are liable to plaintiff.

11.     All of the defendants are citizens of, domiciled in, and/or have their principal place of business in the Commonwealth of Puerto Rico.

### III. FACTS

12.     On January 25, 2013, around 3:22 pm Mr. Christian Maldonado Haeussler ("**Christian**") visited the Emergency Room (ER) at HIMA San Pablo with chest pain, generalized body aches, fever and cough of 2 days of evolution, accompanied by shortness of breath (SOB), headaches, skin rash, eyes secretions, and sore throat. Christian was a 25 years old male patient with history of Insulin Dependent Diabetes Mellitus (IDDM); Hypertension  (HTN); Peripheral Neuropathy; Bronchial Asthma (BA); and Neuropsychiatric Disorder (ND). He  also referred the pain as acute, persistent, continuous, and not relived by anything, not even by his NEURONTIN® under use. A fingertip Glucose Dextrose Stick (Glc DxS) sample was performed, resulting in serum glucose levels of 374 mg/dL.

13.     Christian first ER medical evaluation took placed at 3:44 pm (22 minutes since arrival). The primary informant was the patient himself, who was described at that time as a fair historian. Once again, he complained of fever, adding chills to the list of symptoms, since the

day prior to evaluation, and confirming the SOB, the generalized skin rash, weakness, and malaise. His Vital Signs (VS): Blood Pressure (BP) 94/58 (Mean Arterial Pressure, MAP 70); Heart Rate (HR) 126 beats/min; Respiratory Rate (RR) 19/min; Temperature (T) 38.7℃. Upon examination, the patient had no described significant findings but, was found alert, active and fully oriented (i.e. time, place, and person); without neurological deficits; clear to pulmonary auscultation; presenting dry oral mucosas, and a macular skin rash with erythema, and no active pruritus. By 6:45 pm a new Glc DxS was reported as 421 mg/dL; until then, no insulin administration was recorded in the medical chart. At the 7:00 pm (over 3 hours since arrival), Regular Insulin 8 units IV were charted, though not administered until 7:30 pm. A follow up order to repeat the Glc DxS in 1 hour thereafter, was given.

14.     At 9:00 pm, January 25, 2013, Christian was described by the ER physician, Dr. John Doe, as stable, but still feverish and acute (T 38-40℃; HR 108-142 beats/min); a diagnostic impression of Dehydration, "Dermatic" lesions R/O Suppurative Rash, and Uncompensated Diabetes Mellitus (DM) were documented. Consequently, Subcutaneous (SQ) and Intra-venous (IV) Regular Insulin administration, IV Fluids (IVF) of 0.9% Normal Saline Solution (NSS) at 120 cc/hr, and a single dose of 2 gr ROCEPHIN®, proceeded. An Internal Medicine (IM) consultation was then placed by the ER physician requesting an evaluation for the uncontrolled DM and the skin lesions.

15.     On January 25, 2013 Dr. Forti answered the IM consultation at 9:50 p.m., with a hospital admission to HIMA San Pablo, and with diagnosis of Hyponatremia, Sepsis, and Metabolic Acidosis; in its assessment, the skin lesions were signaled as potentially infectious in etiology.

16.     During his history and physical examination, January 25, 2013, Dr. Forti

4

described the patient as *"very poorly cooperative"*; and living alone. He recorded complaints of fever, chills, skin lesions, fatigue, visual changes, chest pain, dysuria, joints, and back pain. He only registered a history of DM, no history of vaccines updating; and failing to record any drug allergies. The reported VS: BP 110/80; HR 75 beats/min; RR 16/min; T 38.7℃. No abnormal physical findings were defined; no neurological deficits either, but an adequate alertness; no consciousness, clinical distress, or mental orientation abnormalities were mentioned. No pulmonary auscultation was recorded. The presence of papular skin lesions with no anatomical location, were documented.

17.    The admission medical orders, as given by Dr. Forti mostly consisted of IVF's (NSS increased to 125 cc/hr), HUMALOG® insulin SQ Administration with fingertip Glc DxS Assessment Protocols, symptomatic treatment, the antibiotic VANCOMYCIN, and blood samples which included an Arterial Blood Gas (ABG) ordered at 7:00 pm and which was finally performed at 9:00, showing a pH 7.49 // PaO2 80.1 mm Hg // PCO2 27.6 mm Hg // HCO3⁻ 21.4 mm Hg// Sat. O2% 96.9 // FIO2 21%.

18.    During the morning of January 26, 2013, (05:00 a.m.) while admitted to HIMA San Pablo but still at ER, Nursing Notes reported the patient as developing respiratory distress, becoming in need of supplemental O2 (2-3 L by nasal cannula), and with consequent clinical improvement afterwards. During the rest of the day, the Glc DxS fluctuated between 156-349 mg/dL; with T 36.9-40℃ (HR 76-142 beats/min; BP 96/68-125/58) for which enteral antipyretics were consistently administered (TYLENOL®). Christian began to complain of stomach upset, nausea, loss of appetite, and anxiety; the presence of body aches and the persistence of the active skin rash, remained. Despite these findings, medical orders did not vary around the primary admitting diagnoses, nor the medical assessment. The next Dr. Forti

evaluation took place at 9:30 pm, January 26, 2013 (23 hours and 20 minutes after the  initial evaluation), describing the patient as feeling better.

19.    In the next 48 hours the patient continued symptomatic, and became unstable,  as the nursing and the Dr. Forti progress notes described.

20.    By January 27, 2013, Christian complained of not resting during the night and  the early morning due to a progressive and continuous cough, accompanied by SOB, as well as weakness; that same day, he presented temperatures above 36.6-38.8℃, HR 86-140 beats/min, BP 78/56-104/66, RR 16-21/min; Glc levels between 202-327 mg/dL; and the sustaining skin eruptions. A possible Pulmonary Embolism (PE) was then considered and a targeted  intervention implemented. GENTAMICIN antibiotic was added to the treatment, and a Chest CT Scan was ordered (performed at 09:55 am January 27, 2013). The patient was transferred to general ward without any significant events recorded, thereafter.

21.    At 8:00 am, on January 28, 2013, Christian was evaluated by the Skin  Care Program. They found him restless, in obvious respiratory distress, and with a Ventury Mask (VM) at a 35% $O_2$ concentration; his skin was described as dry, with generalized multiple dark brown spots and eschars; and a with limited mobility of his upper and lower extremities.  A dermatology consultation was recommended. Eighteen minutes after this evaluation (8:18 am), Christian underwent an abrupt episode of deep abdominal respirations, having a RR 45/min,  HR 148 beats/min, BP 90/80, and T 37.2℃. An Orange medical code was implemented; ABG's obtained at that time showed: pH 7.51 // $PaO_2$ 41.9 mmHg// $PCO_2$ 26.5 mm HG// $HCO3^-$ 21.4 mm Hg// Sat. O2% 83.3% // $FIO_2$ 35%.

22.    Several medical consultations followed the event, including  Endocrinology (January 28, 2013, 2:45 pm, which did not get to evaluate the patient at any time); the  Infectious

Diseases (January 28, 2013, 2:02 pm); and the Pulmonary Services (January 28, 2013, 3:00 pm). It was mainly the latter which described Christian as acutely ill, dyspneic, severely hypoxemic, immunocompromised, and with an impending Respiratory Failure, and which recommended a transfer to the Intensive Care Unit (ICU). At 4:00 pm, Christian's VS were HR 120, BP 90/60, RR 22/min, and T 37.1℃; Glc 226 mg/dL; ABG's (16:22): pH 7.52 // PaO$_2$ 332 mmHg // PCO$_2$ 26.0 mmHg // HCO3⁻ 22 mm Hg // Sat. O2 % 100 % // FIO$_2$ 100 %.

23.     The impending respiratory failure was managed, and other diagnostic possibilities considered, such as a Bronchopneumonia (confirmed by the CT Scan performed on January 27, 2013, 09:55 am), and a bacterial Endocarditis. Within the hours, as Christian deteriorated, he was finally ordered to be transferred to the ICU (6:00 pm). Despite this, no major medical  treatment variations were introduced thereafter, but those directed to the respiratory failure management.

24.     Around the same time (5:25 pm), on January 28, 2013, while the patient was still at the general ward, the nursing staff recorded the patient's declared intention to leave HIMA San Pablo Against Medical Advice (AMA). After documentation in the medical progress  notes regarding the intervention attained toward convincing the patient to the contrary, the patient signed and left the hospital AMA (6:00 pm). The documentation also included the fact that the patient's mother Ms. Elizabeth Haeussler Navarro explicitly opposed the AMA procedures and that she requested toward not letting the patient leave his medical treatment.

25.     A nursing medication reconciliation on January 27, 2013 (9:00 am) showed the patient in the following outpatient therapy prior to his hospitalization at the HIMA San Pablo; none of which were given during this hospitalization, but XANAX®: ENALAPRIL,  TOPROL®, LANTUS®, HUMALOG®, and PROZAC®. No instructions were documented regarding the   re-initiation of these upon release; no recommendations or medications were either prescribed  upon

leaving AMA from HIMA San Pablo.

26.     On January 29, 2013, at 03:10 am (9 hours and 10 minutes after leaving HIMA San Pablo the patient worsened and continued deteriorating. He was taken to the Centro Cardiovascular de Puerto Rico y del Caribe (CCPRC) where he was admitted acutely ill, with complaints of severe SOB, chest pain, and Congestive Heart Failure (CHF); and was still presenting the skin lesions. Even though an aggressive treatment management was instituted, the patient underwent a Cardio Respiratory Arrest (CRA); without an effective response to the resuscitation methods Christian was declared dead on January 30, 2013, at 1:30 pm.

27.     A follow up autopsy revealed an Acute Respiratory Distress Syndrome (ARDS) with a Bilateral Acute Pneumonia; Cerebral Edema; an Uncontrolled DM; Anemia; a Generalized Visceral Congestion; and Multiple Diffuse Lineal Scars suggestive of prior suicidal attempts (as per history). Conclusion: Death by Natural Cause.

28.     Christian died as direct consequence of the gross negligence of all co-defendants.

29.     Because of the continued errors, omissions, inadequate and clearly erroneous medical treatment, as well as an evident abandonment and disregard for Christian well-being on the part of Dr. Forti, the physicians, nurses, HIMA San Pablo and the hospital personnel, Christian suffered immensely and prematurely died.

30.     The medical treatment given to Christian during his hospitalization at HIMA San Pablo was one of evident apathy and disregard for his well-being and abandonment on the part of Dr. Forti, the physicians, nurses and HIMA San Pablo hospital personnel; there was a lack of monitoring, negligent and inadequate treatment as well as lack of analysis and evaluation of his conditions, thus inhibiting and/or eliminating any possibility of recovery and causing his premature death.

31.     During his hospitalization Christian was tendered by Dr. Forti, the physicians, nurses and paramedical personnel of HIMA San Pablo and they are therefore jointly and severally liable to plaintiff for all damages caused by their negligence under Articles 1802 and 1803 of the Civil Code of Puerto Rico.

32.     Christian's untimely death was caused by the negligent and/or late treatment that was given to him by all codefendants. Had it not been by all the tortuous and negligent acts, and omissions of all co-defendants his damages and his death, as well as the plaintiff's damages could have been avoided.

33.     Co-defendants Dr. Forti, Dr. John Doe, Dr. Richard Doe and Dr. John Roe were grossly negligent in their treatment and/or lack thereof. To wit: failure to respond and treat the patient in a timely and adequate manner; lack of supervision and follow up of a gravely ill patient; inability to recognize clear signs and symptoms of an Acute Respiratory Illness (ARI), an Influenza-Like Illness (ILI), and a rapidly progressive Community Acquired Pneumonia (CAP) with a persistent and consequent uncompensated Respiratory Alkalosis, and a Hypoxemic state and implement corrective treatment in a timely manner, among others. Their negligent acts, errors and omissions directly caused and/or contributed to the damages, deterioration and death of Christian.

34.     Co-defendant HIMA San Pablo had a duty to utilize due care and follow accepted medical standards in providing hospital care to Christian.

35.     Co-defendant HIMA San Pablo is also liable for the inadequate m e d i c a l treatment, or lack of thereof, given to Christian by its medical, nursing and paramedical personnel, including the other unknown codefendants; for their lack of supervision and monitoring; for delayed and/or lack of implementation of diagnostic and therapeutic orders by its

personnel; for allowing practices in the management of the patient in violation of its own protocols for the best practice of the medicine. The negligent acts and omissions of their medical, nursing, paramedical, technical and administrative personnel directly caused and/or contributed to the damages, deterioration and death of Christian, who had come to HIMA San Pablo desperately seeking lifesaving treatment.

36.     Co-defendants HIMA San Pablo and Dr. Forti are also liable because despite Christian critical condition and instability, a decision to leave HIMA San Pablo Against Medical Advice (LAMA) on January 28, 2013 was basically unquestioned and granted; and even when that decision was an inner reflection of the patient's despair, and a likely desperate attempt to seek for attention for his critical situation. One, that became radically aborted once it was formally and politely dispatched by the LAMA itself, and showing nothing but the same neglecting patterns of his whole hospital stay. Christian was unlikely suitable for a LAMA decision making-process on January 28, 2013 at HIMA San Pablo; this conclusion supports itself by the patient's own medical history and his lack of insight regarding an ailment for which he was not been offered appropriate medical care and by which he was still critically affected. He was not even offered with any ambulatory treatment or follow up management, which may have potentially safeguarded his welfare to some extend thereafter.

37.     As a direct and proximate result of the negligent acts and omissions described above, plaintiffs Christopher Maldonado Haeussler and Chris Maldonado Haeussler, Christian brothers, experienced and continues each day to experience pain, suffering and emotional distress, as their brother dies due to the gross negligence of all co-defendants. They request as compensation for their damages a sum of not less than Six Million Dollars ($6,000,000.00).

38.     Under Fed. R. Civ. P. 38, the plaintiff demands trial by jury of all issues in this

case.

39.     To the extent the defendants deny liability for the negligent acts and  commissions alleged herein, they act with obstinacy and temerity, and are therefore liable for prejudgment interest and attorney's fees.

## IV.     PRAYER FOR RELIEF

WHEREFORE, the plaintiffs very respectfully pray that the Honorable Court  enter judgment against the defendants and award damages in their favor in the amount of $6,000,000.00, plus costs interest and attorney's fees.

RESPECTFULLY SUBMITTED, in San  Juan, Puerto  Rico,  this 7th day of December of 2017.


 s/Rafael O. Baella-Ors
 (U.S.D.C. P.R. #219504)
Attorney for the plaintiff
*Baella-Ors Law Offices L.L.C.*
563, Pedro A. Bigay St.
Ext. Baldrich, San Juan, P.R. 00918
Tels. (787) 250-8080 & (787)763-4734
Fax: (787) 281-6006
rbaellaors@baellalaw.com